Dale B. **MENARD**, Appellant,

v.

William B. **SAXBE**, Attorney General of the United States and Clarence M. Kelley.

No. 71–1768.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 3, 1973.

Decided April 23, 1974.

Ralph J. Temple, Washington, D. C., with whom Howard Adler, Jr., Bruce P. Saypol, R. Raymond Twohig, Law Student, Noah Menard, Robert A. W. Boraks, Thomas C. Arthur, Warren C. Nighswander and Keith S. Watson, Washington, D. C., were on the brief, for appellant.

James F. McMullin, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, and Joseph M. Hannon, Asst. U. S. Attys., at the time the brief was filed, were on the brief, for appellees.

Before LEVENTHAL and ROBB, Circuit Judges, and GASCH,* United States District Judge of the United States District Court for the District of Columbia.

LEVENTHAL, Circuit Judge:

Appellant Dale B. Menard brought this action praying that the files of the Federal Bureau of Investigation be purged of all information relating to his detention by the Los Angeles police on August 10, 1965. In prior proceedings before this court, we reversed summary judgment in favor of appellees because of the "necessity for a clear and complete factual record as a basis for adjudication." Menard v. Mitchell, 139 U.S. App.D.C. 113, 430 F.2d 486 (1970). On remand, the District Court, after a full trial, declined to order expungement, but limited distribution of Menard's record to Federal and state law enforcement agencies and agencies of the Federal Government for the purposes of employment.[1] Menard v. Mitchell, 328 F.Supp. 718 (D.D.C.1971). We hold that Menard is entitled to an order directing the FBI to remove his record from its criminal files, and therefore remand.

### I. THE ARREST

At the time of his arrest, Dale Menard was a 19-year-old college student spending the summer working in Los Angeles. On the evening of August 9, 1965, he visited with friends in the vicinity of Sunland Park, a recreational area in Los Angeles. At approximately 11:30 p. m., Menard walked to the park to wait for a friend who had arranged to pick Menard up and drive him to his room in a Los Angeles suburb (JA 165–69). The friend failed to arrive at the agreed time, and in the early hours of August 10th, after dozing on a park bench and then walking across the street to look through the window of a rest home in search of a clock, Menard returned to the bench to wait once more. See Joint Appendix (JA) 169–71.

At approximately 3:00 a. m., Menard was approached by two Los Angeles police officers (JA 171–73), who questioned him about a prowler report from the rest home. They also confronted him with a wallet they evidently had found on the ground near the park bench. (JA 179, 308). The wallet contained $10 and bore the name and address of an individual who lived about three miles from Sunland Park. (JA 175, 219–220). Despite Menard's insistence that he knew nothing of the wallet, and despite the subsequent arrival of Menard's friend, who corroborated his account, Menard was placed under arrest, booked and fingerprinted at the stationhouse, and held in police custody for over two days. No criminal complaint was ever filed; no evidence was found indicating that the wallet had been stolen; and no information was adduced that tied Menard to any crime. Nevertheless, the Los Angeles police routinely forwarded to the FBI a fingerprint card, containing Menard's fingerprints and the notation that he had been arrested for burglary and two days later "Released—Unable to connect with any felony or misdemeanor at this time." The FBI has retained a record of Menard's arrest.[2]

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. However, in P.L. 92–184, 85 Stat. 642 § 902, passed December, 1971, Congress effectively overruled a portion of the District Court's decree by expressly authorizing dissemination to: "officials of federally chartered or insured banking institutions to promote or maintain the security of those institutions, and, if authorized by State statute and approved by the Attorney General, to officials of State and local governments for purposes of employment and licensing . . . ."

2. Originally the record read as follows:
Date Arrested or Received—8–10–65
Charge or Offense—459 PC Burglary

A few months later, Menard's mother wrote the FBI to inquire whether any record had been kept of the encounter; the Bureau referred her to the California authorities. Correspondence continued for over a year, with the FBI, the Los Angeles police, and the California Department of Justice each taking the position that it was powerless to effect the removal of the record from the FBI's files.

However, on January 16, 1968, after the complaint in this action had been filed earlier in the month, the FBI had a special agent review the Los Angeles police file.[3] By April 1968 the FBI record was changed, "upon decision of Federal Bureau of Investigation and United States Attorney's Office."[4] The entry for "Disposition or sentence" originally read: "Released—unable to connect with any felony or misdemeanor at this time." As changed, the FBI record shows that two days after Menard was arrested, he was "Released—Unable to connect with any felony or misdemeanor—in accordance with 849b(1)—not deemed an arrest but a detention only." Although the change entry does not say so specifically, it presumably referred to California Penal Code § 849(b)(1).[5]

Unable to obtain relief expunging his arrest record through the administrative processes, Menard turned to the courts.

## II. OPERATIONS OF THE IDENTIFICATION DIVISION OF THE FBI

The record developed in the trial court subsequent to our order of remand presents information concerning the Identification Division of the FBI, which has maintained fingerprint and arrest records since 1924. The Attorney General is authorized to maintain identification files by 28 U.S.C. § 534, which provides:

§ 534. Acquisition, preservation, and exchange of identification records; appointment of officials

(a) The Attorney General shall—

(1) acquire, collect, classify, and preserve identification, criminal identification, crime, and other records; and

(2) exchange these records with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.

(b) The exchange of records authorized by subsection (a)(2) of this section is subject to cancellation if dissemination is made outside the receiving departments or related agencies.

(c) The Attorney General may appoint officials to perform the functions authorized by this section.

---

Disposition or Sentence—8–12–65—Released—Unable to connect with any felony or misdemeanor at this time.
Occupation—Student
Residence of Person Fingerprinted—Saticoy & Canoga
Canoga Park
The record was amended so that the entry "Disposition or Sentence" now reads:
8–12–65—Released—Unable to connect with any felony or misdemeanor—in accordance with 849b(1)—not deemed an arrest but detention only.

3. "On January 16, 1968, the arrest record of Dale Bruce Menard, Los Angeles Police Department (LAPD) Number 760 111–M, was reviewed by a Special Agent of the FBI." Defendants' Answers to Plaintiff's Second Interrogatories, Item 6, filed November 30, 1970.

4. Defendant's Answer filed April 12, 1968, to Plaintiff's Interrogatory #3, served March 26, 1968.

5. Calif.Penal Code § 849(b)(1) (West Supp. 1970) provides:
Any peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever:
(1) He is satisfied that there is no ground for making a criminal complaint against the person arrested. Any record of such arrest shall include a record of the release hereunder and thereafter shall not be deemed an arrest but a detention only.

# 1021

The practice of the FBI in implementing the statute reflects a series of positions taken by the Attorney General over the years. These have been codified in 28 C.F.R. § 0.85(b), which provides that the Director of the FBI shall:

Conduct the acquisition, collection, exchange, classification, and preservation of identification records, including personal fingerprints voluntarily submitted, on a mutually beneficial basis, from law enforcement and other governmental agencies, insurance companies, railroad police, national banks, member banks of the Federal Reserve System, FDIC-Reserve-Insured Banks, and banking institutions insured by the Federal Savings and Loan Insurance Corporation; provide expert testimony in Federal or local courts as to fingerprint examinations; and provide identification assistance in missing persons type cases, including those from insurance companies.

The Chief of the Technical Section of the FBI's Identification Division described the Division as a "central depository for fingerprints submitted to us on a volunteer basis." (JA 482). These records are maintained in separate criminal files and "applicant" files. The FBI's criminal files consist of those prints submitted in connection with an arrest or conviction. The FBI's applicant files consist of prints submitted in conjunction with induction into the armed services, applications for government employment, or other activity pursuant to which local authorities deem it appropriate to require fingerprinting to determine whether the applicant has a criminal record. The records are not sorted or cross-referenced in any way, nor is there special treatment of records of juveniles. (JA 88-9).

The Bureau also maintains a file containing only the name of the individual and his prints.[6] Primary contributors to this file, which is used for identification purposes only, are tourists, who submit their prints as they tour FBI facilities. (JA 656-57). This information may be made available to private groups, such as insurance companies, for the sole purpose of establishing identity, often in the case of missing or deceased individuals. (JA 629-630).

Two hundred million fingerprint cards are currently on file with the FBI, of which 19 million relate to criminal activity. (JA 511). Fingerprints are submitted to the Bureau by Federal, state and local agencies, on standard cards issued by the FBI (JA 10, 12, 201). The Bureau checks its records when it receives a fingerprint card and reports back to the contributing agency any prior arrests or convictions contained in its files.

The FBI disseminates records to contributing agencies throughout the country. For each "applicant" fingerprint card submitted to it by an "authorized agency"[7] the Identification Division runs an automatic identification check (JA 46-7). If there is no prior arrest or conviction record, the FBI returns the fingerprint card with the notation, "No arrest record F.B.I." (JA 471). If "criminal" fingerprint cards have previously been submitted, the contributing agency receives a copy of the records of the individual's prior arrests. (JA 46-7, 54-5, 74, 95-6). Where "criminal" cards are submitted, the Bureau notes the information and sends the law enforcement agency such information as the FBI has.

The Division also receives hundreds of "name check" requests from "legitimate sources," including congressmen and contributing agencies, asking for criminal records with only the subject's name given as identification. Whenever pos-

6. The record does not tell us what name is given to these files, and we shall for convenience refer to them as general identification files.

7. "Authorized agencies" include all agencies of the federal government, all state and local law enforcement agencies, and all state and local agencies authorized by statute or regulation to submit fingerprints to the FBI. JA 489, 631, 641-42.

sible, the Division honors these requests. The number of such "name checks" was estimated to be "in the hundreds" per day (JA 464).

During Fiscal 1970, the Identification Division processed 29,000 fingerprint cards daily, of which 13,000 were arrest submissions and another 16,000 noncriminal submissions from the approximately 8,000 contributing agencies (JA 457–58; 11, 466). "The workload in the Division has reached the point," testified Beverly E. Ponder, Chief of the Technical Section, in the spring of 1972, that "we cannot handle any more work." (JA 645) However, some relief was expected when the Bureau occupies new quarters (JA 646).

Fingerprint arrest records are removed by the FBI from the files of the Identification Division when the contributing agency so requests. No inquiry is made as to the reasons supporting the request of the local agency for the return of the record. (JA 649). During fiscal 1970 over 6,000 records were returned in this manner, and that "is a growing statistic" (JA 650). The FBI retains its arrest records even where the record indicates that the arrestee was released without being charged,[8] since it is the FBI's firm policy that "The FBI does not have the authority to decide which fingerprints submitted by law enforcement agencies should be returned. Such a decision rests solely with the original contributor of fingerprints."[9] If the FBI makes the arrest, it will remove the arrest cards from its files "on a court order only" (JA 22).

With the apparent exception of the Bureau's action in altering plaintiff's record in the instant case,[10] the FBI has never returned a fingerprint record on its own motion. Moreover, the Bureau will not amend, alter, or even reveal a record at the instance of a private individual, (JA 22–28), taking the position not only that the decision to expunge must be made at the local level, but also that disclosure to an individual of the contents of his record will not be permitted, "inasmuch as data contained in our files is confidential and cannot be furnished to private individuals."[11]

If a person inquires whether the FBI has fingerprints on file, no search is made except in what is considered a "justified cause"—the case of a missing person, or a problem of someone trying to settle an estate (JA 23). Other persons—e. g., those concerned about job prospects or possible Government employment—are not told whether a card exists, but are simply referred to the agency which supplied the fingerprints. (JA 26). This policy is adhered to even if the inquiry is made by someone who does not remember the circumstances of his being fingerprinted, or even whether he was fingerprinted (perhaps because he was inebriated, see JA 28, or conceivably a victim of amnesia). Under its practices, the FBI is not concerned about an inaccuracy, beyond suggesting that the individual contact the local agency (JA 27–30).[12] These practices of the FBI have evolved over time. They are not reflected in any memorandum of procedures or regulation (JA 33).

### III. PROPRIETY OF ACTION AGAINST THE FBI

Menard seeks the elimination of his arrest record from the FBI's files and

8. See JA 21.

9. Plaintiff's Exhibit # 2: Letter of July 15, 1966, from John Edgar Hoover to Mrs. Anita B. Menard.

10. See note 2, *supra*, and accompanying text.

11. Plaintiff's Exhibit # 12; Letter of March 18, 1966, from John Edgar Hoover to Mrs. Anita B. Menard.

12. Mr. Ponder also testified (JA 27): If there is some problem involved and he is challenging the accuracy of the record, then we are certainly going to assist in getting this inquiry answered and answered promptly and properly." In the instant case, the Bureau did not assist Mrs. Menard in contacting the California authorities, but merely suggested that she do so. With the California authorities insisting that they were powerless to act, the result was a bureaucratic standoff.

rests his claim on a broad base of legal doctrine. It is claimed that retention of his record violates the Fourth and Fifth Amendments of the Constitution, subjects him to harsh penalties without being accorded due process of law, denies him the equal protection of the laws, and violates his rights to privacy.

Appellant is naturally concerned that the incident in which he was, by happenstance, subject to police detention has led to his becoming the subject of a criminal file. The first legal issue that arises is whether he has merely suffered personal distress, or whether there is legal injury.

Although Menard cannot point with mathematical certainty to the exact consequences of his criminal file, we think it clear that he has alleged a "cognizable legal injury." Finley v. Hampton, 154 U.S.App.D.C. 50, 54, 473 F.2d 180, 184 (1972). See also Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). In Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), this court held that an action for expungement of arrest records is justiciable. On a careful review of the jurisprudence we concluded, see 478 F.2d at 968: "The principle is well established that a court may order the expungement of records, including arrest records, when that remedy is necessary and appropriate in order to pre-serve basic legal rights." This court, like other courts,[13] held that unlawful maintenance of records of arrest results in "injuries and dangers" that are "plain enough," 478 F.2d at 790, and that "this threat is not dissipated, or rendered insubstantial or illusory, by the fact that the arrest was not followed by a prosecution." 478 F.2d at 962 (footnote omitted).

The judicial remedy of expungement is inherent and is not dependent on express statutory provision, and it exists to vindicate substantial rights provided by statute as well as by organic law, United States v. McLeod, 385 F.2d 734 (5th Cir. 1967). Thus, for example, both this court and the District Court for the District of Columbia have ordered the expungement of records of police action taken in flagrant violation of the Fourth Amendment. In Sullivan v. Murphy, *supra*, we required expungement of records of mass arrests where established procedures broke down so that there was no showing of probable cause. And in Gomez v. Wilson, 323 F.Supp. 87 (D.D.C.1971), the District Court, Chief Judge Curran, required the return of "any and all such Police forms, indexes, and cross-indexes connected with the [plaintiff] and this case" where it found that the police had twice stopped plaintiff, questioned him as to his activities, and filled out a vagrancy observation form when they had

13. For illustrations of the doctrine that courts may, in appropriate circumstances, order the expungement of criminal records see, *e. g.*, Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938 (1973) (mass arrests where procedures rendered judicial determination of probable cause impossible); United States v. McLeod, 385 F.2d 734 (5th Cir. 1967) (expungement of arrest records ordered when court determined that arrests were for sole purpose of harassing civil rights workers); Bilick v. Dudley, 356 F.Supp. 945 (S.D.N.Y.1973) (expungement of arrest record ordered when court found that arrests were without probable cause and had overtones of harassment of group because of political beliefs); Hughes v. Rizzo, 282 F.Supp. 881 (E.D.Pa.1968) (expungement ordered where arrests were for purpose of harassing "hippies"). Discussion of the disabilities flowing from a record of arrest as an appropriate ground for judicial relief appear not only in the *Menard* case previously before this court, as Menard v. Mitchell, 139 U.S.App.D.C. at 117–118, 430 F.2d at 490–491; but also in Sullivan v. Murphy, *supra*, Morrow v. District of Columbia, 135 U.S.App.D.C. 160, 417 F.2d 728 (1969); Kowall v. United States, 53 F.R.D. 211, 215 (W.D.Mich.1971); Bilick v. Dudley, 356 F.Supp. 945, 951 (S.D.N.Y.1973); Wilson v. Webster, 467 F.2d 1282, 1283–1284 (9th Cir. 1972); Davidson v. Dill, 503 P.2d 157, 159 (Colo.1972); Eddy v. Moore, 5 Wash.App. 334, 487 P.2d 211, 216 (1971).

We are not here concerned with the issue of "applicant" files, which present separate and different considerations.

no articulable suspicion that he was engaged in any illegal activity.[14]

The disabilities flowing from a record of arrest have been well documented: There is an undoubted "social stigma" involved in an arrest record.[15] "[I]t is common knowledge that a man with an arrest record is much more apt to be subject to police scrutiny—the first to be questioned and the last eliminated as a suspect to an investigation." [16] Existence of a record may burden a decision whether to testify at trial.[17] And records of arrest are used by judges in making decisions as to sentencing, whether to grant bail, or whether to release pending appeal.[18]

The arrest record is used outside the field of criminal justice. Most significant is its use in connection with subsequent inquiries on applications for employment and licenses to engage in certain fields of work. An arrest record often proves to be a substantial barrier to employment.[19] It appears, *inter alia*,

that Menard's FBI record was supplied, subsequent to the filing of the complaint in this case, to the Marine Corps and the National Agency Check Center.[20]

The jurisprudence on expungement of arrest records has developed, thus far at least, in actions brought against appropriate officials of the government whose officers had responsibility for making the arrest, initiating the arrest record, maintaining the arrest record, and determining the consequences, as in maintaining prosecutions. There arises for consideration the significance of the circumstance that in the action before us it is the Los Angeles police who made the arrest for a violation of state law, and who initiated the arrest record, while the defendants are officials of a federal agency whose involvement and responsibility turn on the receipt, maintenance and dissemination of the allegedly invalid arrest record.

Ultimate disposition of an action against a records agency based on main-

14. Although plaintiff appealed, that portion of the District Court's order that required expungement was not appealed by the Government and so became final. See Gomez v. Wilson, 155 U.S.App.D.C. 242, 477 F.2d 411, 414 n. 10 (1973).

15. That a record of arrest is a "record involving social stigma," see United States v. Dionisio, 410 U.S. 1, 10, 93 S.Ct. 764, 35 L. Ed.2d 67 (1973), quoting from Judge Friendly's opinion in United States v. Doe (Schwartz), 457 F.2d 895 at 898 (2d Cir.).
   See also Thompson v. Washington, 162 U.S.App.D.C. ——, 497 F.2d 626, 635, in which this court pointed out: "And Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) establishes that a person's interest in his own reputation merits procedural due process protection." (1973).

16. Davidson v. Dill, 503 P.2d 157, 159 (Colo.1972).

17. Menard v. Mitchell, 430 F.2d at 491.

18. See, *e. g.*, Russell v. United States, 131 U.S.App.D.C. 44, 402 F.2d 185 (1968) (record of arrests may be used to determine whether appellant may be released pending appeal); United States v. Cifarelli, 401 F.2d 512 (2d Cir.), cert. denied, 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 448 (1968) (in imposing sentence, trial judge may consider evi-

dence of other crimes for which defendant was not convicted); Jones v. United States, 113 U.S.App.D.C. 233, 307 F.2d 190 (1962), cert. denied, 372 U.S. 919, 83 S.Ct. 733, 9 L.Ed.2d 724 (1963) (pre-sentence report may include, and judge may consider, records of charges not leading to convictions); 23 D.C.Code § 1321(b) (permits judicial officer, in determining the conditions of pre-trial release, to take into account defendant's "past conduct, . . . record of convictions, and any record of appearance at court proceedings").

19. See, *e. g.*, Menard v. Mitchell, 430 F.2d at 490, n. 17:
   At the very least, an arrest record is likely to lead to further investigation; and if it is convenient to fill the job before the investigation is complete, the applicant is effectively denied employment because of his record.
   See also, *e. g.*, Report of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia (1967); Miller, The Closed Door: The Effect of a Criminal Record on Employment With State and Local Public Agencies (Georgetown University Criminal Law Institute, 1972).

20. Defendants' Answer, filed Nov. 30, 1970, to Item 3 of Plaintiff's Second Interrogatories.

tenance and dissemination of unlawful arrest records would require decisions on a number of issues, and the interlacing of multiple stands of law. There would be issues such as whether the preservation of constitutional rights embraces, as a corollary, a strict liability like that which pervades the related field of responsibility of publication of libels,[21] a responsibility based on the extent of knowledge in hand or imputable, or on a duty to make inquiry.

■ We think sound principles of justice and judicial administration dictate that in general actions to vindicate constitutional rights, by expungement of arrest records maintained notwithstanding release of the person and absence of probable cause for arrest, be maintained against the local law enforcement agencies involved.[22] The primary duty of executive inquiry into the facts of distant arrests is a burden assigned more appropriately to the local agency whose officials made the arrest than to the FBI. Further, an official finding that an arrest is tainted by illegality stigmatizes the local enforcement agency to some extent—apart from the possibility of damage actions—and should be avoided where an alternate course is available. If the local law enforcement agency is a

party to the action, it will have opportunity, in instances where it considers the claim improper, to present effectively its version of events and support its denial of relief.

In general, the role played by the FBI's Identification Division is derivative, and relief granted solely against the FBI in this context may be incomplete. The offending "arrest record" remains in the files of the local law enforcement agency, and a question arises whether the person involved would be obligated to advise future employers and others that he had been arrested. With the local enforcement agency as defendant, complete relief can be granted, both to obtain such action on local records as may be needed, and to have local authorities request the return of records.[23] Such requests are always honored by the FBI.[24]

We are also reluctant, in the absence of a need greater than that established by this record, to concentrate in the Department of Justice the burden of over-all litigation over maintenance of arrest records. Of the 19 million criminal prints on file with the Identification Division, it is impossible to predict how many would be the subject of dispute. We are concerned with the possible ef-

21. See, e. g., Prosser, Torts, § 113, p. 766 ff. The author refers, *inter alia*, to rulings "that there may be an affirmative duty to remove a publication made by another, where for example the defendant's bulletin board is used for the purpose."

22. This includes the agencies and officials with responsibility for making the arrest, initiating an arrest record, maintaining an arrest record, determining appropriate disposition, whether, *e. g.*, there has been exoneration. If more than one agency is involved there may be multiple defendants; indeed, it may be that a single action may be maintainable against state and federal officials as well as the initiating local agency.

23. Provision of local venue will also interrelate with evolving state and local procedures to cope with this problem. For example, California's statutes provide for determination in some instances that an arrest is deemed solely a detention. (See fn. 5). An action against the local police could at least

raise the question whether in such case they are not obligated, by fair implication of the state law, to withdraw whatever "arrest" record was sent to the FBI.

New York has recently adopted a procedure which does not formally qualify the arrest but inhibits the generation of the record that leads to legal injury. Under this procedure, if an arrested person brought to the stationhouse makes satisfactory explanation to the arresting officer, the latter must order a release without any stationhouse booking, N.Y.Crim.Proc.Law § 140.20(4) (McKinney's Consol.Laws, c. 11–A, 1971). Presumably this also gives room to the supervising police office to exercise discretion to modify the initial decision to arrest.

24. See JA 649: Testimony of Special Agent Beverly Ponder, Chief of the Technical Section of the Identification Division:
Q: If a police department asks it [the fingerprint record] back, you send it back, no questions, is that correct?
A: That is correct.

fects of a concentration of burden not only on the FBI [25] and the Department of Justice, but also on this court and the District Court for the District of Columbia.

Our conclusion should not be taken to reflect a judgment of the insubstantiality of Menard's claims. On the contrary, the gravity of those claims underscores the need for their adjudication between the appropriate parties. Conventional doctrines of venue may operate to localize the forum, but will not interfere with a call on cognizant Federal courts in the venue when administrative remedy is unavailing.

## IV. DUTIES UNIQUE TO THE FBI

■ Insofar as Menard's action attacks abuses of the Identification Division in its unique role in the information network, suit against the Bureau is proper. What began modestly in 1924 is now, in the words of the District Judge, "out of effective control." [26] Due primarily to the Bureau's limited resources, there is no followup to assure that records of arrest frequently are amended to show an ultimate non-criminal disposition. There are no controls on the

accuracy of information submitted by the contributing agencies.[27] The Bureau exercises little supervision and control over contributing agency uses of the records the FBI disseminates.[28] We are not now called upon to evaluate these practices of the FBI. However, this case does call upon us to take into account that the FBI's function of maintaining and disseminating criminal identification records and files carries with it as a corollary the responsibility to discharge this function reliably and responsibly and without unnecessary harm to individuals whose rights have been invaded. The FBI cannot take the position that it is a mere passive recipient of records received from others, when it in fact energizes those records by maintaining a system of criminal files and disseminating the criminal records widely, acting in effect as a step-up transformer that puts into the system a capacity for both good and harm.[29]

The process of the Identification Division for sifting out submissions to determine what it retains in its criminal files [30] is one that requires more attention. If the form is correct,[31] the FBI will place in its criminal files virtually any information from local agencies ar-

---

25. See JA 645.

26. 328 F.Supp. at 727.

27. The Bureau does not check assertions of purpose, for example, that appear on the face of the submitted card. (JA 668).

28. The FBI does not inquire into the uses made of arrest records it sends to contributing agencies. (JA 55). All records, however, are stamped with the notation that only authorized use is permitted; but "authorized use" is not defined on the stamp. Contributing agencies may disseminate records to other contributing agencies, but dissemination to agencies that are not authorized by the FBI to receive records is not an "authorized use." (JA 82). However, the FBI does not send a list of authorized agencies to its contributing agencies. *Id.* Despite newspaper reports and other external indication of misuse of arrest records, the Bureau will not investigate alleged misuses of records unless presented with a direct complaint (JA 499–500, 507) of which

there are about four or five yearly. (JA 120).

29. Although the record before us does not contain data concerning the computerization of the FBI's records, it does reveal that a computerization program is proceeding apace, increasing the Division's effectiveness, and enhancing its capacity for both good and harm.

30. Special Agent Ponder testified that "we have a large screening process." (JA 690). The first operation upon receipt of a card is to check that it contains all relevant information, including "person to be notified in case of emergency." (JA 658).

31. The Identification Division is quite strict in demanding adherence to the requirements that the fingerprint card be completed as indicated. For example, the card requires that the contributing agency indicate the reason for which the record is requested. If that information is not included, the card is returned without an accompanying record. (JA 667).

guably related to criminal activity.[32] The FBI returns to the local agencies 10 percent of the criminal cards submitted when there are illegible fingerprints or incomplete data on the fingerprint form.[33] But if the form is satisfactory and purports to record an arrest, the FBI makes no further inquiry and forthwith makes an entry in a criminal file.

In Menard's case, after his complaint was filed, the FBI had a Special Agent review his Los Angeles arrest record,[34] and it then amended the FBI record "upon decision of Federal Bureau of Investigation and United States Attorney's office." [35] The change was a significant one. The FBI record continues the reference to an "arrest" on August 10, 1965. But it amends the "disposition" on August 12, 1965. A statement was added: "in accordance with [Calif. Penal Code] § 849b(1)—not deemed an arrest but detention only." [36] Even more significant, the original notation that the Los Angeles police "were unable to connect with any felony or misde-meanor at this time" was amended to drop "at this time."

This was done after Menard filed his complaint asserting that no crime at all had been committed. And in the lawsuit the Government expressly adopted the plaintiff's Statement of Material Facts as to Which There Is No Material Issue (filed, June 18, 1968) that "defendants know of no crime committed by anyone incident to plaintiff's detention" (adopted by defendants on July 2, 1968). Nevertheless, Menard's record remained in the FBI's criminal files, along with the mass of arrest records, subject to dissemination in the same way as all arrest records.[37]

Having been informed that Menard's encounter with the Los Angeles police authorities was purely fortuitous, the FBI had no authority to retain this record in its criminal files along with the mass of arrest records. This is simply not consistent with the FBI's duty, corollary to its function of keeping identification records, to take appropriate measures to assure that this function is

32. If the card indicated an arrest with the disposition "dismissed," the FBI would nonetheless retain the card for its files. (JA 21).

33. See JA 18.

34. See note 3, *supra.*

35. Defendant's Answer filed April 12, 1968, to Plaintiff's Interrogatory #3, served March 26, 1968.

36. Section 849(b)(1) authorizes a peace officer to release an arrested person from custody if "[h]e is satisfied that there are insufficient grounds for making a criminal complaint against the person arrested." Section 849(c) provides that after such release "such arrest shall not be deemed an arrest, but detention only."
  Section 11115 provides:
  In any case in which a sheriff, police department or other law enforcement agency makes an arrest and transmits a report of the arrest to the Bureau of Criminal Identification and Investigation or to the Federal Bureau of Investigation, it shall be the duty of such law enforcement agency to furnish a disposition report to such bureaus whenever the arrested person is transferred to the custody of another agency or is released without having a complaint or accusation filed with a court.
  If either of the following dispositions is made, the disposition report shall so state:
  *    *    *    *    *
  (b) "Detention only," when the detained party is released pursuant to paragraph (1) of subdivision (b) of Section 849. In such cases the report shall state the specific reason for such release, indicating that there was no ground for making a criminal complaint because (1) further investigation exonerated the arrested party, (2) the complainant withdrew the complaint, (3) further investigation appeared necessary before prosecution could be initiated, (4) the ascertainable evidence was insufficient to proceed further, (5) the admissible or adducible evidence was insufficient to proceed further, or (6) other appropriate explanation for release.

37. When the FBI is asked by an appropriate agency whether a person has a criminal record, it focuses on whether or not the person has an "arrest record." The inquiry card will be returned to the agency without any information only if the FBI certifies "no arrest record" (JA 471).

discharged responsibly and that the records are reliably informative.

■ We note that we are focusing here on the FBI's "arrest records" and "criminal files," and we do not prohibit the maintenance of neutral identification records. When the FBI apprised that a person has been exonerated after initial arrest,[38] released without charge and a change of record to "detention only," the FBI has the responsibility to expunge the incident from its criminal identification files. The change of the FBI record to record the lack of connection of Menard with any crime and the characterization of the apprehension of Menard by the Los Angeles police as "in accordance with [California Penal Code] § 849(b)(1)" "deemed [not] an arrest but a detention only" indicates a local determination to that effect,[39] responsive to the FBI's own inquiry of the local authorities.[40]

The FBI cannot turn aside its responsibility by claiming that it is powerless to act absent a specific and formal request from the Los Angeles police for withdrawal of the record. Dependence on other agencies may be sound enough for a practice born of expedience, but it may not be made rigid, like a rule of law, in neglect or defiance of basic rights. While the Congressional program contemplates a major role for the local authorities, it does not contemplate Bureau abdication to the local authorities. The statute itself confirms the principle of FBI responsibility in section 534(b), providing for cancellation of exchange privileges if local agencies make records available to unauthorized users, and the Bureau recognizes its obligation to review this participation by local authorities.[41]

■ The Identification Division has the responsibility for maintaining an appropriate separation of the various files it is authorized to establish, and for preventing the criminal identification files, subject as they are to dissemination, from containing inappropriate material. This appears from the legislative history.[42] Congress intended to differentiate "criminal identification" from

---

38. In the circumstances at bar, the FBI's investigations gave it information equivalent to a formal notation by California police pursuant to § 11115 of the California Penal Code, that "further investigation exonerated the arrested party."

39. This is a fair implication, taking into account general FBI practice, although the record does not specifically state on what basis the FBI amended the record.

40. See footnote 36.

41. While this is the stated policy of the Bureau, it has not aggressively policed use of its records, see note 28 *supra*, and has in fact, since 1924, suspended the privileges only of six local law enforcement agencies, none of them major departments. (JA 507).

42. In the limited debate attendant on the statute's original enactment, Congressman Cochran of Missouri questioned the broad authority being given the FBI to collect fingerprints. Congressman Graham of Pennsylvania, Chairman of the House Judiciary Committee, which had reported the bill favorably, replied:

I would like to say that what the gentleman from Missouri has been saying has no application whatever to the matter of fin-

gerprints. This has nothing to do with the bureau of the Department of Justice where criminal records are kept so as to be available anywhere in the United States.

There are two classes of information that is gathered. One is criminal records, and another is the information that is gathered about criminals that is not a matter of record. That they do not give out, but the criminal records they do give out. That information is gathered for the department itself and its agents, in order that they more effectually do their work. 72 Cong. Rec. 1989 (71st Cong., 2d Sess., Jan. 20, 1930).

Initial statutory authorization was limited to the acquisition and preservation of "criminal identification and other crime records." 5 U.S.C. § 340 (1964), repealed, Pub.L.No. 89-554, § 8(a), 80 Stat. 632, 648 (1966). Under the present statute, the Attorney General is directed to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records." 28 U.S.C. § 534(a). That section, however, was enacted by Pub.L.No.89-554, § 4(c), 80 Stat. 611, 616 (1966). Section 7(a) of the Act, 80 Stat. 631, states that "The legislative purpose in enacting sections 1-6 of this

other information that the FBI is authorized to gather. We think it equally clear that the distinction intended by Congress should be drawn with regard to record of an encounter with law enforcement agencies that did not result in arrest.[43] Although it is information that may aid FBI personnel to "more effectively do their work," it is not information that the FBI may maintain in its criminal files "so as to be available anywhere in the United States." The FBI has an obligation, enforced by our ruling, to take account of responsible information, even though not cast in the form of an express request from the local agency for return of the record, that the "arrest" record previously submitted did not communicate an information properly retained by the Bureau in its criminal files as an arrest record. Our ruling is in no way onerous, for the Identification Division has a sizeable screening staff,[44] and substantial detriment to the individual is at stake.[45]

An arrest is distinct from other interactions between citizen and police. An arrest "is the initial stage of a criminal prosecution."[46] When coupled, as here, with custody, it renders permissible a complete search of the person, assuming probable cause for the arrest, although such a search absent an arrest runs afoul of the Fourth Amendment.[47] In contrast stand many other encounters between police and citizen, even in the course of criminal investigation, that do not have the quality of an arrest and its characteristic as the opening of a criminal chapter. "The police talk to too many people in the course of a day . . . [in] routine police investigation" to insert either a requirement of formality binding on the police,[48] or to permit the encounter to be memorialized as an arrest. It would be monstrous to suppose that all persons questioned by the police, many of them "cooperative and law abiding citizens"[49] could properly be enshrined, for reasons of bureaucratic practice, in the FBI's criminal records. The same principle applies when a person is subject by the police to detention short of an arrest, for as the stop-and-frisk cases make clear, a police detention may be justified by a mere "suspicion" that falls short of the probable cause required by the Constitution for an arrest.[50]

We need not decide whether or to what extent the Constitution forbids the Government from contributing to the harm to the individual that may attend maintenance of a criminal file showing, as an arrest, what was only a chance encounter.[51] We need not reach this question, for we place our decision on statutory grounds. There is a settled rule for statutory interpretation to avoid serious constitutional issues[52] and this properly has some application in the case at bar. But even without the sup-

---

Act is to restate, without substantive change, the laws replaced by those sections on the effective date of this Act."

43. A similar claim was raised by appellant when this case was first before us, but was rejected on the grounds that it was not established by "the facts established on the cross-motion for summary judgment." For this and other reasons, the case was remanded in order to develop "a clear and complete factual record as a basis for adjudication." Menard v. Mitchell, *supra*, 430 F.2d at 489, 494.

44. See note 30, *supra*.

45. See notes 15 to 20, *supra*, and accompanying text.

46. Terry v. Ohio, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968). See also United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

47. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467 (1973).

48. [Vance] Allen v. United States, 129 U.S. App.D.C. 61, 64, 390 F.2d 476, 479 (1968).

49. *Id.*

50. Terry v. Ohio, *supra*, note 46.

51. Compare Constantineau v. Wisconsin, *supra* note 15.

52. *See, e. g.*, Richmond Co. v. United States, 275 U.S. 331, 346, 48 S.Ct. 194, 72 L.Ed. 303 (1928); Thompson v. Washington, cited *supra* note 15, 162 U.S.App.D.C. ——, 497 F.2d 626, 633.

port of this doctrine, we think it plain that 28 U.S.C. § 534 precludes the Identification Division from maintaining in its criminal files as an arrest record an encounter with the police that has been established not to constitute an arrest.[53]

We are not in this case enjoining the FBI from maintaining Menard's fingerprints in its neutral non-criminal files, provided there is no reference of any kind to indicate that the prints originated in a source for criminal files. We do not discern any reasonable claim of legal injury from being included in such general identification files, which also include, e. g., the prints voluntarily submitted by tourists,[54] and which are not translated into the FBI's centralized "rap sheets" reporting to all participating agencies on a person's criminal record. However, our order does protect Menard from the injury portended by inclusion of his record and prints in the FBI's centralized criminal files, for their continued inclusion in those files

is, in our view, inconsistent with the intent of Congress.

Indeed, as we pointed out in Sullivan v. Murphy, *supra,* 156 U.S.App.D.C. at 63, 478 F.2d at 973: "the chief threat to the individual who has been unlawfully arrested arises from the inclusion of his records in the police department's *central* criminal files" (emphasis added), as contrasted with a mere stationhouse record, which is needed to avoid secret police arrests (and harassments and shakedowns) and to protect police against unfounded lawsuits. Absent clear expression of legislative intent, we cannot conclude that Congress intended the individual to be threatened by inclusion in the central criminal files, which are kept to facilitate indexing and future reference.[55]

The case is remanded to the District Court with instructions to enter an order directing appellees to remove appellant's record from their criminal files.

So ordered.

---

53. We are concerned with the judicial role of determining what is required by the statute (and Constitution). While in this case we are required to disapprove the action of the Department of Justice, we think it appropriate to take note that subsequent proposals of that department are congruent with the premises of this opinion. We refer to the regulations concerning the dissemination of criminal record data recently proposed by the Department of Justice, 39 Fed.Reg. 5636 (Feb. 14, 1974). These reflect the Department's judgment that records subject to dissemination should be limited to those arising out of serious interaction between the individual and law enforcement authorities. They further note that only "serious and/or significant violations" are includible in criminal record information systems (§ 20.32). The term "criminal offender record information" is defined in § 20.2(c) to include "only . . . identifying data and notations of arrests." · This excludes mere detentions. This meaning does not depend on negative implication, for the regulations go on to provide a specific exclusion of arrests for loitering and "suspicion." This insures that

those who are arrested but as to whom the police are "unable to connect with any felony or misdemeanor" (the words of Menard's record) do not find themselves with a criminal record subject to full dissemination.

54. The FBI's practice of maintaining fingerprint files for purposes other than preservation of criminal records, is related in the record before us, JA 629–30, 656–57. The statute provides separately, for authority to preserve "identification" and "criminal identification" records, see 28 U.S.C. § 534(a)(1). The regulation refers, inter alia, to "personal fingerprints voluntarily submitted" by banks, insurance companies, etc. and to a FBI mission to "provide identification assistance in missing persons type cases." 28 C.F.R. § 0.85(b).

55. While, as already noted, this order would not prohibit inclusion of Menard's record in the general identification files (*supra* note 6), we do not purport to decide whether such inclusion is appropriate under the FBI's regulations pertinent to establishment of those files. That question is not before us.