**Winford FEAGIN, Plaintiff,**

v.

**G. Michael BROGLIN, et al., Defendants.**

**No. S86–239.**

United States District Court, N.D. Indiana, South Bend Division.

July 18, 1988.

Norman R. Buls, Portage, Ind., for plaintiff.

David L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause came before the court for trial from June 27 to June 29, 1988 on several claims brought pursuant to 42 U.S.C. § 1983 by plaintiff Winford Feagin. The claims arise from an altercation on July 17, 1985 between Mr. Feagin and Michael Blough, a correctional officer at Indiana's Westville Correctional Center ("Westville"), where Mr. Feagin was an inmate. Prison disciplinary charges were brought against Mr. Feagin as a result of the altercation, and he was found guilty and disciplined. Mr. Feagin appealed the disciplinary board's findings to Westville Superintendent G. Michael Broglin, who affirmed the finding while modifying the penalties.

Mr. Feagin made three claims for relief: (1) a claim for damages for an alleged Eighth Amendment violation by Lt. Blough; (2) a claim for damages from Supt. Broglin for the alleged denial of Fourteenth Amendment rights by denial of witnesses at a disciplinary hearing without a reason; and (3) an equitable claim against Supt. Broglin, asking that the disciplinary board's finding against him be expunged because of the unconstitutional denial of witnesses.

At the close of Mr. Feagin's evidence, the court granted Supt. Broglin's motion for directed verdict, Fed.R.Civ.P. 50(a), with respect to the damages claim against him for want of evidence that Supt. Broglin acted recklessly or in callous disregard of Mr. Feagin's rights. The jury returned a verdict for Lt. Blough on the Eighth Amendment claim. While the jury deliberated, the court heard further evidence on the equitable claim against Supt. Broglin. This memorandum is intended to satisfy the requirements of Fed.R.Civ.P. 52 with respect to the equitable claim.

I.

The altercation between Mr. Feagin and Lt. Blough occurred in a court yard at Westville. Testimony at trial indicated that anywhere from forty to two hundred inmates were in the court yard at the time of the altercation. The events began when Lt. Blough took Mr. Feagin, in handcuffs, from the office of Lt. Rowe, where Mr. Feagin had attempted to speak with inmates Ware and Scott, who were suspected of assaulting Mr. Feagin. Mr. Feagin was taken in handcuffs first into the court yard, then into "N dorm", where the handcuffs were removed, then back into the court yard where the altercation occurred. Lt. Blough's nose was broken during the altercation.

Mr. Feagin was placed in segregation in the General Services Complex. A disciplinary charge of "battery on staff" was filed on July 17. Screening officer Donald Fine [1] informed Mr. Feagin of the charge on July 19, and asked who Mr. Feagin wanted as witnesses. Mr. Feagin understood that Westville policy allowed him only two live witnesses, who had to be from his complex. Accordingly, he listed Ware and Scott (who were in segregation as a result of their suspected role in the attack on Mr. Feagin) and asked Officer Fine about getting witness statements from other inmates who had been in the court yard, but were not in segregation. Officer Fine told him that would be the responsibility of Mr. Feagin's lay advocate. Officer Fine did not ask for the names of persons whose statements Mr. Feagin might want. Mr. Feagin's hearing before the Conduct Adjustment Board ("C.A.B.") was scheduled for July 23, then continued to July 30.

Westville has no policy or custom restricting the number of written witness statements an offender can have. Such statements generally are obtained by the screening officer; offenders usually do not get their own statements.

Mr. Feagin selected an inmate named Carpenter as his lay advocate. Carpenter also was housed in the General Services

---

1. Officer Fine did not testify at the trial. Apparently, he has vanished.

Complex; lay advocates must be chosen from the inmates in the same complex as the inmate charged. Under Westville procedures, a lay advocate in one complex cannot get witness statements from inmates in other complexes. Westville is comprised of three complexes which are, for most purposes, treated as separate institutions. Inmates cannot pass freely from one complex to another.

Mr. Feagin made a list of inmates that he saw in the court yard at the time of his altercation with Lt. Blough. An officer in the General Services Complex provided him with the documents necessary for Mr. Feagin to learn their identification numbers.

On July 25, Mr. Feagin wrote to the director of the General Services Complex: "As it is my right to present documentary evidence in my behalf I ask that statements be taken from the following named offenders regarding the incident that occurred July 17 1985 on the I.C. court yard." Mr. Feagin then set forth the names of twenty-one inmates, including Ware, Scott, Davis and Williams. Mr. Feagin closed his letter by saying, "I feel that this right have been denied me by the G.S.C. screening officer Officer Fine by refusing to accept these names and numbers and obtain the most needed statements. It's far beyond means of my lay advocate he being a resident of the G.S.C. complex. My hearing is set for Tuesday July 30th 1985 8 AM."

Mr. Feagin's letter produced no response and did not find its way into the file of the disciplinary proceeding. Neither the C.A.B. nor Supt. Broglin saw the letter.

Mr. Feagin appeared on July 30 for his hearing with his lay advocate, but without his requested witness statements. The court accepts as true Mr. Feagin's testimony that he renewed his request for witness statements before the C.A.B., but was told that the C.A.B. had three written statements on Mr. Feagin's behalf, and the hearing would proceed as scheduled. Mr.

Feagin was given written statements from inmates Davis and Williams, who had been on Mr. Feagin's list, and Mornton, who had not been on the list. The C.A.B. had received those statements; the record contains no explanation of how those statements came to be presented to the C.A.B. The three statements corroborated Mr. Feagin's version of the altercation with Lt. Blough.

If inmates requested additional witness statements, the practice of Conduct Adjustment Boards at Westville in 1985 was to ask the inmate why he needed the evidence, then look at the extent of the evidence available and decide whether to grant a continuance. If, in light of the seriousness of the offense and available evidence, the additional evidence would be repetitive and time-consuming, the C.A.B. would deny the request; if it appeared that additional information would be useful, the C.A.B. would refer the matter to an investigator.

Ware, Scott and Mr. Feagin testified at the C.A.B. hearing. Ware and Scott had not been in the court yard; they offered information only concerning the handcuffing of Mr. Feagin in Lt. Rowe's office, and the initial portion of Lt. Blough's escorting of Mr. Feagin. The C.A.B. considered that testimony and the written statements of Davis, Williams, Mornton [2], Lt. Blough and Lt. Rowe, and concluded, "We do not believe the offender nor the witnesses version of the incident and since the officer was an eye-witness, we find that on 7–17–85 offender W. Feagin did commit Battery upon Officer Blough by striking him with his fist while being uncuffed and being escorted by the officer."

The disciplinary hearing contained no reference to any request for additional witnesses or statements. The C.A.B. determined that Mr. Feagin should be placed in segregation for six months, be deprived of 180 days' credit, be demoted in credit class from Class I to Class III [3], and be transfer-

---

**2.** The written record from the C.A.B. does not refer specifically to the written statements from the inmates. The court does not believe, however, that the C.A.B. would have received the statements, disclosed the statements to Mr. Feagin, and then ignored them entirely.

**3.** Offenders in Class I earn one day of credit time for each day served. Offenders in Class III earn no credit time.

red to a maximum security institution. Westville is a medium security institution.

Mr. Feagin appealed the C.A.B. determination to Supt. Broglin pursuant to Department of Correction rules. Among the grounds for appeal was the denial of his request to be provided with witness statements. Supt. Broglin checked the written record, which reflected no request for additional witness statements, and directed Officer Ayres to conduct an investigation. Officer Ayres' written report covered many topics, but made no reference to the witness issue. Supt. Broglin upheld the C.A.B.'s finding, but reduced the sanction: he overturned the loss of credit time and the demotion in credit class; he affirmed the six months' disciplinary segregation and transfer to a maximum security prison. He added, "I find no procedural errors in this case." Mr. Feagin was transferred to the Indiana State Prison, a maximum security institution, and served three months' segregation.

At trial, Mr. Feagin submitted the testimony of four inmates besides himself concerning the incident with Lt. Blough:

1. Albert Scott, who did not observe the court yard incident, testified consistently with the statement he had given the C.A.B., corroborating Mr. Feagin.

2. Lionel Smith, who had been present with Mr. Feagin and Lt. Blough in "N dorm" just before the incident and observed the courtyard altercation, essentially corroborated Mr. Feagin's version of the incident.

3. Gregg Crisler, who saw Mr. Feagin and Lt. Blough enter "N dorm" and saw some of the court yard incident, corroborated portions of Mr. Feagin's version, but it appeared that Mr. Crisler had given greater concentration to the basketball game in which he was involved.

4. Charles Richards testified that he saw Lt. Blough take Mr. Feagin into "N-dorm" and corroborated parts of Mr. Feagin's testimony concerning that portion of the incident. He did not see the court yard altercation.

The defendants also presented trial testimony that had not been before the C.A.B.

Testimony concerning the events at the C.A.B. hearing came from Mr. Feagin and Vernon Brown, who chaired the hearing. Mr. Brown, who has participated in more than 5,000 disciplinary hearings in the past six years, had no independent recollection of Mr. Feagin's hearing. The defense attempted to prove the events of the hearing through Mr. Brown's review of the documentary exhibits and his testimony of what usually was done at disciplinary hearings in 1985. While such evidence is relevant and probative, Fed.R.Evid. 406, the court was deeply troubled by the inconsistencies between Mr. Brown's trial testimony and an affidavit he submitted earlier in the case. Accordingly, to the extent Mr. Feagin's testimony conflicted with Mr. Brown's evidence of routine practice as evidenced by the documents in the file, the court has credited Mr. Feagin's testimony. As a result, the court finds that Mr. Feagin requested additional witness statements and his request effectively was denied without evaluation.

## II.

While the parties have argued the law extensively, they cited the court to only two cases. The earlier of the two, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), was the first Supreme Court case to recognize an inmate's right to call witnesses in a disciplinary proceeding. The Court held that an inmate "should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566. The Court cautioned that "some amount of flexibility and accommodation" must be afforded prison officials, and that prison "officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements ..." *Id.*

The *Wolff* Court declined to hold that prison officials must state their "reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases", *id.*, and found it necessary to reaffirm that point in *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). The Court rejected the position of the Massachusetts Supreme Judicial Court that reasons must appear in the administrative record, and also rejected arguments that an inmate must show a pattern or practice of denying requests and that a uniform policy of denial of witness requests is proper. The Court held "that prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but that they may do so either by making the explanation a part of the 'administrative record' or by presenting testimony in court ..." 105 S.Ct. at 2196.

### A.

During closing argument, Mr. Feagin's counsel questioned Westville's policy, unwritten but real, of allowing only two live non-party witnesses. The court concludes that under the facts of this case, Mr. Feagin can gain no benefit from any conflict between that policy and *Wolff* and *Ponte.* Mr. Feagin did not ask for more than two live non-party witnesses. While his failure to do so may be understandable in light of the policy, the court will not expunge the record of his "conviction" because the C.A.B. did not grant a request he never made. The C.A.B. did not refuse him additional live witnesses.

### B.

The C.A.B. did, however, refuse Mr. Feagin additional documentary evidence, and the right to present documentary evidence consisting of witness statements would seem, from *Wolff* and *Ponte,* to stand on the same procedural ground as the right to present live witnesses. The defense stresses, however, that Mr. Feagin has not shown what the "missing" witnesses would have told the C.A.B. Each side presents an argument on this point that, if carried to its logical conclusion, would eviscerate *Wolff* and *Ponte.* The court can accept neither argument.

The defendants contend that, just as federal courts have discretion to limit the number of repetitive witnesses to be called at trial, *see Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974), so must prison disciplinary boards have such discretion. Accordingly, the defendants contend, an inmate cannot be deemed to have a right to call repetitive or cumulative witnesses. Unless Mr. Feagin shows that his would-be witnesses would not have been repetitive and cumulative, he cannot be deemed to have been deprived of any right.

The defendants' argument cannot survive close analysis, however. First, the common law rule allowing limits upon repetitive witnesses is based on the minimal marginal value of, for example, an eleventh or twelfth witness to prove a matter to which ten witnesses already have testified. *See* 6 J. Wigmore, *Evidence* § 1908 (Chadbourn rev. 1976). The marginal value of a seventh or eighth offender's statement to refute the written testimony of two correctional officers may not be minimal.

Second, the defendants' analysis would, in most instances, render the limited *Wolff* right to present witnesses and documentary evidence meaningless. In most prison disciplinary settings, the charged inmate will have both his own testimony and personal knowledge of the events upon which the charge is based. Under those circumstances, the defendants' argument would provide a bar to the charged inmate's presentation of any evidentiary material other than his own testimony. Other evidentiary material would be cumulative. Such a result could not but offend *Wolff* and *Ponte.*

The plaintiff argues that in credibility matters one can never determine in advance whether additional inmate evidence will tip the balance in favor of the inmate. Accordingly, it would seem, the inmate's right to present witnesses and documentary evidence could not be restricted by any limit. *Wolff,* however, spoke of the need for flexibility and accommodation and the

need for discretion to keep the hearing within reasonable limits. Such considerations necessarily would include the discretion to limit, under proper circumstances, the amount of evidence concerning an event that may have been witnessed by dozens of inmates. *Cf. Ward v. Johnson,* 667 F.2d 1126, 1130 (4th Cir.1981) (suggesting that witnesses may not be denied on grounds of repetitiveness).

### C.

■ The court need not resolve this intriguing issue, however, because the facts before the court, even assuming a constitutional violation by Westville officials, do not warrant the equitable remedy of expungement.

The Seventh Circuit has held that expungement of a violation from an inmate's prison record may be an appropriate remedy for due process violations, *Ware v. Heyne,* 575 F.2d 593 (7th Cir.1978), although a harmless error may not warrant expungement. *See Hayes v. Thompson,* 637 F.2d 483, 493 (7th Cir.1980); *McCall–Bey v. Franzen,* 585 F.Supp. 1295, 1299–1300 (N.D.Ill.1984). Further, in other settings, courts have concluded that expungement may be ordered when necessary and appropriate to preserve basic legal rights. *United States v. Doe,* 556 F.2d 391, 393 (6th Cir.1977); *Sullivan v. Murphy,* 478 F.2d 938, 968 (D.C.Cir.), *cert. denied* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973). The authority to order expungement is not dependent upon an express statutory provision. *Menard v. Saxbe,* 498 F.2d 1017, 1023 (D.C.Cir.1974).

The inherent authority to expunge is, however, a narrow one. *United States v. McMains,* 540 F.2d 387, 390 (8th Cir.1976); *United States v. Henderson,* 482 F.Supp. 234 (D.N.J.1979). Determination of the propriety of expungement involves a balancing of the harm caused to the plaintiff by the records' existence against the utility to the defendants of the records' maintenance. *Hobson v. Wilson,* 737 F.2d 1, 65 (D.C.Cir.1984); *Patton v. LaPrade,* 524 F.2d 862, 868 (3d Cir.1975); *National Treasury Employees Union v. I.R.S.,* 601

F.Supp. 1268, 1273 (D.D.C.1985); *United States v. Henderson,* 482 F.Supp. at 243.

The adverse collateral consequences to the plaintiff should be examined in determining whether the records should be expunged. *Dedrick v. Wallman,* 617 F.Supp. 178, 184 (S.D.Iowa 1985); *McCall–Bey v. Franzen,* 585 F.Supp. at 1300. First, Mr. Feagin is assigned to the Indiana State Prison, a maximum security institution, rather than the medium security institution to which he was assigned at the time of his hearing. At trial, Mr. Feagin testified to the adverse effects of that assignment: he is housed in a cell rather than in a dorm; the food is worse; a worse class of offenders reside at the State Prison; the environment of the State Prison is more violent; and State Prison inmates are required to buy their own televisions, while each dorm at Westville has its own color television.

Second, Mr. Feagin has a battery "conviction" in his institutional record. At trial, he testified that every time he comes up for "annual review", his battery conviction is brought up. As an example, he mentioned that he recently was assigned to a work release center for four weeks, and then was reclassified due to previous institutional misconduct and sent back to the State Prison. He conceded, however, that he has an additional assault "conviction" in his record from April, 1986. Accordingly, the court cannot easily evaluate the effect of the 1985 "conviction" over and above the 1986 entry.

The defense has an institutional interest in accurate records. Security and disciplinary decisions should be informed by records of prior misconduct, particularly if a prior incident involved an attack on a correctional officer. To so phrase the interest loads the question in the defense's favor, of course: Mr. Feagin contends that Sgt. Blough was the assailant.

As a court sitting in equity, however, this court may consider the jury's decision. Following a trial at which Mr. Feagin was disallowed no witnesses, the jury failed to agree with Mr. Feagin. While the disallowance of witnesses or witness statements would, in the usual case, be sufficient to

undermine confidence in the integrity of the prison disciplinary hearing, this is not the usual case. Even without the benefit of evidentiary material that Mr. Feagin was disallowed, the C.A.B. effectively came to the same decision as did the jury. The court does not attribute conclusive weight to the jury's decision, but believes that, under the unique circumstances of this case, it is entitled to substantial weight.

In other words, expungement would require the deletion from institutional records of a decision that appears likely to have been correct, albeit one reached by an improper process. This is not to say that the procedural error was harmless because the Conduct Adjustment Board likely would have reached the same result. *See Dedrick v. Wallman*, 617 F.Supp. at 184 ("harmlessness is not determined with reference to whether or not the particular disciplinary sanction would have been imposed even if the inmate had been given due process."). The court concludes, not that the finding of guilt likely was inevitable, but rather that it likely was correct.

In light of the importance of accuracy and completeness of prison records concerning prior inmate-officer violence, the court, after balancing the harm caused to Mr. Feagin by the records' existence against the utility to the institution of the records' maintenance, concludes that the balance favors the defense.

### III.

Accordingly, the court, in the exercise of its equitable discretion, concludes that the reference in Mr. Feagin's prison records to the incident of July 17, 1985 should not be expunged. Judgment shall be entered for defendant G. Michael Broglin on the plaintiff's equitable claim.

SO ORDERED.